1              UNITED STATES BANKRUPTCY COURT

2                 SOUTHERN DISTRICT OF OHIO

3                       AT CINCINNATI

4    In re:  Raenesha Ramone Storey

5                            Case No. 16-13541

6    In re:  Phillip Cary Brantley

7                            Case No. 16-12458

8    In re:  Gwendolyn Bibbs

9                            Case No. 16-13552

10   In re:  Celeste M. Simmons

11                           Case No. 16-13810

12                     APPEARANCES
13   Monica Kindt, Esq. on behalf of the United States
14   Trustee:
15
16   Frank DiCesare, Esq. on behalf of the Chapter 13
17   Trustee:
18
19   Michael Mann, Esq., Chair at Cincinnati Bar
20   Association, Unauthorized Law Practice Division.
21
22   Jeffrey Pfirrman, Esq. on behalf of Creditors:
23
24   Leon Hewitt, Esq. on behalf of Ms. Raenesha Storey:

25

26           BE IT REMEMBERED the above-entitled

27   hearing came on to be heard on the 1st day of

28   December, 2016 before the Honorable Jeffery Hoffman,

29   Judge.

```
 1                    I N D E X

 2   WITNESS

 3   Rashile Netter-Storey

 4      Direct by Mr. Hewitt:        9

 5      Cross by Mr. DiCesare:      19

 6      Cross by Ms. Kindt:        23

 7      Cross by Mr. Mann:         29

 8      By the Court:             32

 9   Raenesha Storey

10      Direct by Mr. Hewitt:      40

11      Cross by Ms. Kindt:        46

12      Cross by Mr. DiCesare:     50

13      By the Court:             58

14

15

16                  E X H I B I T S

17                                       ADMITTED

18   Debtor's Exhibit A                     62

19

20

21

22

23

24

25
```

1          COURTROOM DEPUTY:  This Honorable

2    Bankruptcy Court of the United States, the Honorable

3    Jeffery P. Hopkins is now reconvened pursuant to

4    adjournment.  You may be seated.

5          Case number 16-12458, Philip Brantley,

6    case number 16-13541, Raenesha Ramone Storey, case

7    number 16-13552, Gwendolyn Bibbs, case number 16-

8    13810, Celeste Simmons show cause hearing.

9          THE COURT:  Very well.  Okay, Mr.

10    DiCesare?

11          MR. DICESARE:  Your Honor, Ms...oh,

12    they've come back in.  Mr. Hewitt is here as you can

13    see with Ms. Storey and her mother I believe.  And

14    Mr. Pfirrman is here, Mr. Pfirrman's firm was

15    involved in the dismissal on Brantley.  And they've

16    also got...they've also got motions pending on the

17    Ferguson case which you mentioned in the footnote,

18    the cases may be tied together through Mr. Buckner's

19    actions.  And as well as Ms. Kindt from the U.S.

20    Trustee's Office.  We also have Mr. Mann who is with

21    the Unauthorized Practice Section of the Cincinnati

22    Bar Association.

23          We can't report any changes other than Mr.

24    Hewitt is working with Ms. Storey.  And what we have

25    done though, Your Honor, since we talked about this

1    generally at Ms. Storey's last hearing, is we did

2    listen to the tapes, I'm sorry, the 341 tapes for

3    the Brantley case, the one case that Mr. Buckner's

4    name appears on specifically.

5            THE COURT:  Um-hum.

6            MR. DICESARE:  And as we noted in passing

7    he did attend the 341 meeting. The trustee's report

8    does note that he was in the room.  At the

9    examination the trustee always on a pro se asks the

10   debtor what led them to do this, how did they do it,

11   what resources did they utilize.  Mr. Bucker was

12   identified only as a friend.  And Mr. Brantley

13   specifically stated that he had prepared the

14   petition and schedules himself using Rocket Lawyer,

15   an online service. And I checked, there is such an

16   online service.  So Mr. Brantley was present but

17   nobody admitted to any direct participation. And

18   unlike Ms. Storey's situation nobody has ever said

19   in any of the other cases we've heard that Mr.

20   Buckner received compensation.  But again we believe

21   the Court's right to raise this question, especially

22   in light of what Ms. Storey has represented in her

23   last case or last hearing on her case.

24           THE COURT:  Okay, thank you, Mr. DiCesare.

25   I'm just going to call names in order then and we'll

1    just hear what information you can share with the

2    Court.  And let's hope that the United States

3    Trustees' Program will begin its investigation.

4             So why don't we begin with you, Ms. Kindt,

5    is there anything to report thus far from your end?

6    And while you're approaching the bench, the Court

7    does have notice that Mr. Buckner appears to have

8    had a hand in some other cases that have been

9    recently filed with the Court since this show cause

10   order was issued.  Mr. Buckner, as you all probably

11   know did file with the Court a motion seeking a

12   continuance of 60 days in order to prepare.  I

13   denied that motion yesterday and was expecting that

14   Mr. Bucker would appear.

15            What do we have, Ms. Kindt?  Has your

16   office been able to undertake any investigation thus

17   far?

18            THE COURT:  Good afternoon, Your Honor.

19   Monica Kindt here on behalf of Daniel McDermott,

20   United States Trustee for Region 9.  I appreciate

21   the opportunity to be here today.  We have reviewed

22   the petitions that are in question in the show cause

23   hearing and we've been in conversation with the

24   Chapter 13 Trustee and their staff attorneys.  And

25   we've done a bit of background investigation.

1    Truthfully we were waiting to see if Mr. Buckner

2    appeared today to see if we obtained more

3    information.  And we will proceed in the manner that

4    we normally do in these cases.  Again, I appreciate

5    Your Honor alerting us to this because I think the

6    Chapter 13 Trustee and my office were both in the

7    same boat. You know, on the face of the...which is

8    obviously the problem, on the face of the petition

9    there's no information and Mr. Dicesare has

10   identified an issue that's prevalent with our pro se

11   filers is that there's unwillingness sometimes to

12   discuss any assistance that they've received.  So

13   we, we will be proceeding to determine, you know,

14   first off, whether any compensation was received and

15   if any legal advice was provided.

16        And, Your Honor, I, I know that the order

17   directed me to file a report within 30 days but if

18   we proceed with a 110 motion I assume that that

19   would be equivalent?

20        THE COURT: Absolutely.

21        MS. KINDT:  Okay.

22        THE COURT: I was just at a loss as to what

23   to ask for.

24        MS. KINDT:  No, I understand.

25        THE COURT:  I wanted to alert your office

1    because I suspected that you and others were not

2    aware that Mr. Buckner was engaged in these

3    activities.  It was brought to this Court's

4    attention frankly by the clerk's office staff.  Mr.

5    Buckner is apparently a frequent visitor to the

6    clerk's office.  He has appeared and he pays the

7    filing fee of some of the debtors whose cases he's

8    apparently had a hand in which in itself is a

9    violation of § 110.  So it's apparent to me that's

10   he's engaged in activity that is...falls under the

11   statute, covered by the statute that needs to be

12   addressed and perhaps a cease and desist issued and

13   an injunction had.  It seems that his activity goes

14   beyond the scope of § 110.  He may be even creeping

15   over into the unauthorized practice of law which

16   gave this Court quite a lot of concern.  So I

17   appreciate if it you can, I'll vacate that portion

18   of the order but I would appreciate if you and your

19   office after you've had a thorough opportunity to

20   investigate, will make a decision with regard to

21   filing what's necessary under § 110 to prevent Mr.

22   Buckner's continued activity.

23        MS. KINDT:  Of course, Your Honor.  Thank

24   you for including us, appreciate it.

25        THE COURT:  Thank you.  Okay, Mr. Hewitt,

1      you're here and I appreciate you and your client

2      coming, if you'll step forward I would appreciate

3      hearing from Ms. Storey again.  What I would like to

4      do is put Ms. Storey under oath so that we can

5      hopefully exact from her some of the facts

6      associated with her case and she can advise the

7      Court of Mr. Buckner's involvement.

8              MR. HEWITT:  Thank you, Your Honor.  And

9      if it's okay with the Court I would also like to get

10     testimony from Ms. Storey's mother.

11             THE COURT:  Okay.

12             MR. HEWITT:  Because she, I guess she's

13     the one who had made initial contact in this

14     situation.

15             THE COURT:  Okay.

16             MR. HEWITT:  So maybe if I could put her

17     on first.

18             THE COURT:  Very good.

19             MR. HEWITT:  She may provide...

20             THE COURT:  You can have a seat.

21             MR. HEWITT:  ...greater background

22     information.  Would she need to take the stand or?

23             THE COURT:  Yes, it would be helpful.

24             MR. HEWITT:  Okay.

25             THE COURT: Ms. Storey, if you'll step

1    forward?  Is it also Ms. Storey?

2              MS. STOREY:  Yes.

3              THE COURT:  Okay, will you step forward

4    and be sworn?

5              COURTROOM DEPUTY:  Right here.  Would you

6    please raise your right hand?

7                   (Witness duly sworn)

8              COURTROOM DEPUTY:  Would you please have a

9    seat, speak into the microphone, state and spell

10   your name for the record.

11             THE WITNESS:  Okay.  Oh, okay.  My name is

12   Rashile Netter-Storey.

13                   DIRECT EXAMINATION

14   BY MR. HEWITT:

15       Q    Okay and what is your address, ma'am?

16       A    It's 786 Maidstone Court, Cincinnati,

17   Ohio, 45230.

18       Q    Okay.

19             THE COURT:  Would you spell your name just

20   so we'll have it for the record?

21             THE WITNESS:  Yes.  It's R-a-s-h-i-l-e,

22   hypen, N-e-t-t-e-r.  I'm sorry.  S-t-o-r-e-y.

23             THE COURT: Thank you.

24       Q    Thank you.  Ms. Storey, Mrs. Storey, first

25   and foremost, do you know Mr. Lorin Buckner?

1        A    I know him by communicating with him.   My

2   first communication with him was on October the 9th,

3   2015.

4        Q    And how were you first...how did that

5   first communication take place?

6        A    He actually sent a letter in the mail.

7   Had my daughter's name on it.   And we were like

8   beside ourselves going on with our house, we had

9   tried to do a modification. And when I called him he

10  said, "Oh, no problem, no problem.   I've got this

11  all handled for you.  I understand."   He says, "I

12  have a solution for you all."   And I said, "Really?"

13  And he said he was in Indianapolis talking with his

14  mother-in-law trying to transfer her back here. But

15  he said as soon as he got back in town he would

16  contact me.   And he told me to email him some items

17  like for the house and that kind of a thing.   I have

18  several emails from him that I sent to him,

19  different documents about the house.   And mind you,

20  my daughter was like working and everything and I'm

21  trying to take care of stuff of, you know, just to

22  save the home.   And he was saying, oh yeah, he has a

23  solution.   So when we did meet was October 12th at

24  Panera Bread in Anderson Township.   And my daughter

25  and I was present there.   And he said he understood

1    the stress and everything we were going through.

2    And I was telling him I was walking the floors at

3    night.  He said he knew all that.  He said he had

4    been through all that with the court system with his

5    own home and he said he had a solution for us. And

6    he said the first thing we need to do, the first

7    foremost thing we needed to do he said was to do, to

8    file bankruptcy.  He said because that gives him

9    more time to be able to do what he needs to do

10   because he had a connection somewhere in Chicago

11   with certain people. So that's what we did.  We met

12   with him downtown and he said we had to have $310

13   cash money and then we had to have extra money for

14   him doing it.  So we gave him like $300 extra

15   besides the $310.  This was back in October of 2015.

16   That was the first time.

17        Q   So just, just so we're clear, the first

18   time you gave money to Mr. Buckner, that was $310?

19        A   Plus another $300 for him filing.  He said

20   he had to have money to be compensated for doing all

21   the paperwork.

22        Q   Okay, so he charged for the filing fee and

23   also charged to do the filing?

24        A   Yes

25        Q   Okay, all right and then what happened

1    after that?

2        A    Then after that we were waiting for him to

3    give us more information.  Then he told me that,

4    okay, we're not going to be able to get all this

5    information and stuff done, all this stuff that he

6    had to do, checking with all these different banks,

7    the LaSalle Bank and all this stuff.  He said,

8    "We're going to have to file again."  And then he

9    said, "Not only do you have to file again, my fees

10   in order to do all this, I have to have a fee."  I

11   said, "Well, wait a second, I just gave you the

12   $300."  He said, "Yeah, but I have to have a fee

13   also besides that fee, he said of $3,500."  And so I

14   said, "Okay."  So the next time we filed we gave him

15   extra money to file and his nephew was there.

16   Joel...

17       Q    Do you recall when that was, the following

18   time, the next time, do you recall when that was?

19       A    That was, I'm pretty sure it was like

20   either February, it was either January or February.

21       Q    Okay, of this year?

22       A    Of no...yes, yes, of this year.  And that

23   particular time I came downtown and I had my

24   daughter with me to this building.  I was sitting

25   outside. And I gave her $1,200 or 12 $100 bills.

1    Because this guy named Joe said he had to have that.

2         Q    Who is Joe?

3         A    Joe is the nephew of Lorin Buckner.

4         Q    Do you know his last name?

5         A    Harvey.

6         Q    Joe Harvey?

7         A    Yes, we have an email from him as well.

8         Q    Okay and speaking of which, you did

9    mention emails by the way previously, were you able

10   to go back and collect all the emails?

11        A    Yes.

12        Q    In communication with him?

13        A    Yes, with Mr. Buckner, yes.  I was, I

14   printed some of them out.

15        Q    Okay, could we...

16        A    Mainly...

17        Q    Just one second.  So these are some of the

18   emails?

19        A    Yeah, I think there's like two or three I

20   didn't print out.  They were just...

21        Q    There was...like it's not like all of

22   them, there was more?

23        A    Like two or three of them.  They were just

24   documentation of our house. He was asking different

25   questions about things that the people that were

1    sending us from Select Portfolio.  And other

2    questions he was asking prior before that was Chase

3    and EMC Mortgage.  It's all in Chase but these were

4    different servers and he was asking me questions

5    about that.

6         Q    Okay, but back in January or February of

7    this year you said you gave him how much in cash?

8         A    I gave my daughter 12 $100 bills, I

9    watched her walk into this building and hand it to

10   that guy.

11        Q    Okay.

12        A    Named Joel Harvey.

13        Q    Okay.

14        A    I was parked right in front.

15        Q    Okay and then what happened after that?

16        A    Then he went and filed another bankruptcy.

17        Q    Okay.

18        A    Additional to the $1,200 we had $310

19   separate from the $1,200.

20        Q    Okay.

21        A    And then in February Mr. Buckner was

22   telling me, he said, "Oh, we need this money.  We

23   really need this money to move forward to save your

24   house."  He said, "Then you won't have to worry

25   about any more bankruptcies."  He said, "You've just

1    got to get this money." And I said, "Well, I gave

2    your nephew $1,200." He said, "Well, that's part of

3    it, we'll need the rest." So I met with him at

4    Panera Bread in Hyde Park.

5        Q    When?

6        A    It was in February.

7        Q    Okay.

8        A    And I gave him $2,500 cash because he said

9    that he couldn't use a check, he had to have cash.

10       Q    Okay.

11       A    In order to do these procedures.

12       Q    Okay.

13       A    And so after that I remember us meeting

14   him again downtown to do another bankruptcy. And he

15   told my daughter when they got into the lobby that

16   she would have to go up because the Courts didn't

17   want him coming up or anyone else coming up with

18   her, that she would have to file it by herself this

19   particular time.

20       Q    Okay.

21       A    And then this last time we met with his

22   nephew downtown.

23       Q    When you say last time, when was that?

24       A    Well, this was back in, just recently, I

25   think this was back in October. It was back in

1      October we met with him.

2           Q    October?

3           A    Of this year.

4           Q    Okay.

5           A    And to do another bankruptcy and he told

6      me daughter when she gave him the money, she gave

7      him $310 plus another additional $200 for his

8      services and he told her he wasn't going to do it

9      right then and there, he was going to come back

10     because he had to get back to work.  And so she was

11     saying, "Well, how are we going to know that it was

12     done."  Because every time she had done this they

13     gave her a piece of paper to let her know the thing

14     was filed so it would stop the sheriff's sale.

15     Well, we never heard anything else back from him.

16     So that's when I called Lorin and I said, "Hey,

17     look, we gave this money to your nephew."  And he

18     said, "What do you mean?  You just gave him a couple

19     of hundred dollars."  I said, "What are you talking

20     about?  What do you mean a couple of hundred

21     dollars?"  I said, "I've give you $2,500 and I give

22     him $1,200."  "Oh, yeah, yeah, that's right, that's

23     right." Don't worry about it, I'll take care of it."

24     So it wasn't until later, I think it was either that

25     night or the next evening that he even gave us

1   confirmation that it was even done.  And then to our

2   surprise when we came to court the last time they're

3   saying it wasn't even paid after we gave this man

4   cash money to do it.

5        Q   And that's when you were in court last

6   week when you found out?

7        A   Yes, yes.  Very shocked that he never paid

8   it.

9        Q   Okay and...

10       A   I also want to say that was the first time

11  my daughter wasn't involved coming up to do it

12  her...like with the person.  That was the only time

13  that she didn't do it.  That was the only time that

14  we didn't get a receipt for it.

15       Q   I see.  Okay and the documents I'm holding

16  can you describe these documents for the Court, what

17  they are?

18       A   Yes.  This document here is an email.  I

19  asked them to send so we could have notification of

20  the fact that the bankruptcy was filed and he did do

21  that.  Joel sent that email to my daughter's email

22  address and she sent it to me and I printed it out.

23       Q   This is Joel Harvey, his nephew?

24       A   This is Joel Harvey and this is what he

25  sent us.

1         Q    Okay.

2         A    And also on the email itself he tells us

3    that, "This is a notice of your bankruptcy filing.

4    I am sending you a copy so that you can forward the

5    copy to the attorney handling your case.  This email

6    address is JRC@MKD/llc.com.  This is just a backup

7    to fax over a copy.  I want to make sure that all of

8    our bases are covered."  And so I called Lorin.  I

9    said, "What attorney?  You never talked about

10   attorneys."  He said, "Don't worry about that, it's

11   just a formality."

12        Q    Okay, anything else need to add or would

13   that be about...

14        A    Yes.  I mean most of these emails from me

15   to Lorin are back, is just stuff he asked us to send

16   over for Select Portfolio or different things he was

17   asking.  The one time he asked me to send him the

18   information when the loan first started.   I told

19   him that EMC Mortgage in Ocwen was taking over the

20   loan.  In one of these emails also it says house

21   money.  That's the day, February the 8th, I met with

22   him and gave him that $2,500.

23        Q    I see, okay.  Thank you, ma'am.

24        A    You're very welcome.

25             MR. HEWITT:  Oh, I'm sorry, were there any

                    Tri-County Court Reporting

1    questions from the Court?

2         THE COURT:  Yeah, just a moment, Ms.

3    Storey.  I'm going to open the floor.  Mr.

4    DiCesare...

5         MR. DICESARE:  Yes, Your Honor.

6         THE COURT:  ...or, Ms. Kindt, do you have

7    any questions and...

8         MS. KINDT:  I have...

9         THE COURT:  ...counsel, Mr. Mann, if you

10   have any or Mr. Pfirrman, if you have any as well.

11                   CROSS EXAMINATION

12   BY MR. DICESARE:

13        Q   Ms. Storey, I'm sorry, Ms. Netter-Storey,

14   sorry.  I'm Frank DiCesare, I'm the attorney for the

15   trustee.  I just wanted to check, you knew some of

16   the specific dates and I wasn't writing down fast

17   enough.  You mentioned that when you went to the

18   Panera Bread, you mentioned, I think you mentioned

19   actually a day of the month, do you remember when

20   that meeting was?

21        A   Yeah, the first meeting we had with him

22   was October the 12th, 2015.

23        Q   Okay.

24        A   My first conversation was October the 9th

25   on the telephone.

1       Q    First telephone October 9th?

2       A    Yes.

3       Q    First meeting at Panera in Anderson?

4       A    Yes.

5       Q    Okay, is there way you remember that or is

6    it reviewing your notes recently?

7       A    Well, I remember that because my husband

8    has a recorded conversation.

9       Q    Okay.

10      A    I know that we couldn't use it in Court

11   because...well, wait a minute, my husband did say

12   that, he did tell Lorin that he was going to record

13   it because...

14      Q    The telephone calls?

15      A    Yes.

16      Q    Okay.

17      A    No, the phone call, he reported...he

18   recorded the conversation we had at Panera Bread.

19      Q    Okay.

20      A    Because my husband said it was a lot of

21   information.  He said, "Do you mind if I record

22   this?"  And he said, "Yes, it's fine."  And on there

23   he's telling us to bring the money to him to file

24   the bankruptcy.

25      Q    Okay and you mentioned when you're out in

1    Hyde Park or Anderson you're meeting at Panera or

2    other public places, a couple of times you referred

3    to meeting in a building downtown, do you recall

4    what that building was?

5         A    The building is this building.

6         Q    This building?

7         A    Yes.

8         Q    Oh.

9         A    My daughter, I gave her cash to come into

10    this building.  I was sitting out front because, you

11    know, those meters...

12         Q    Um-hum.

13         A    ...you don't know how long you're going to

14    be there.  So but I saw her walk in, it's a great

15    big glass window and I saw her hand him the money I

16    had just handed her.

17         Q    Okay, so we'll probably ask some questions

18    of your daughter about that but your point is other

19    than meeting at the public restaurants out in the

20    suburbs when you came out down here to file, those

21    first two times that you recall your daughter

22    brought, I'm sorry, your daughter met Mr. Buckner in

23    this building to go ahead and go through the filing,

24    is that right?

25         A    Yes, she did it the first time.  The other

1    time she met with his nephew, Joel Harvey.

2         Q    Okay, is that Joe or Joel?

3         A    Joel.

4         Q    Joel, Joel.

5         A    J-o-e-l.

6         Q    Okay and you said that would be the first

7    time and the second time but the third time you said

8    something different happened?

9         A    The first time we met with Lorin.

10        Q    Okay.

11        A    Okay, the second time it was, as a matter

12   of fact Lorin also came back down to do a dismissal

13   of the bankruptcy.  We met him down here for that.

14        Q    This building again?

15        A    Yes, it was always this building other

16   than Panera Bread.  And then the next time to file

17   another bankruptcy it was his nephew we met with.

18        Q    Okay.

19        A    The other times it was always his nephew.

20        Q    The reason I'm asking that, you don't know

21   of any business location that he or his nephew

22   maintain do you?

23        A    Well, actually my daughter left here one

24   day and walked down the street. He said he worked at

25   an office and she walked down the street and made a

```
1    left.
2         Q    Okay.
3         A    I don't know the address or...
4         Q    Well, we'll ask her if she can remember
5    that.  But I appreciate it.  Thank you very much.
6         A    Yeah.
7              MR. DICESARE: Thank you, Your Honor.
8              THE COURT:  Ms. Kindt, any questions at
9    this point?
10             MS. KINDT:  Actually I think Mr. DiCesare
11   answered most of my questions.  I was just going to
12   follow up on the last business question.  It will
13   only take one second, Your Honor.
14             THE COURT:  Very good, take your time.
15                    CROSS EXAMINATION
16   BY MS. KINDT:
17        Q    Ms. Storey, I'm Monica Kindt, I'm the
18   Assistant United States Trustee for Cincinnati.
19   Thank you very much for coming today and answering
20   these questions.  It's very helpful for us.  As I
21   said Mr. DiCesare has asked all the questions I
22   wanted to ask you.  Except I was wondering if
23   throughout the emails there were any, there was any
24   mention of Encore Renew, of a business by that name?
25        A    Encore Renew?  Encore Renew?
```

1          Q    Or any business name affiliated?

2          A    Yeah, he said something about in Chicago

3    there was some kind of company. And he said

4    something about, but he called me Friday of last

5    week.

6          Q    Okay.

7          A    And he called me five times.  I didn't

8    answer the phone.  And the last time I answered the

9    phone because I had Raenesha call Mr. Hewitt and ask

10   if it was okay for us to talk to him because we had

11   just been in court that week.  And he said it was

12   okay for us to talk but to, you know, write down the

13   information.  And what he was asking me, he says,

14   "Well, now" he said "You heard anything new?"  I

15   said, "What are you talking about?"  And I played

16   just as dumb but to hear what he had to say."  He

17   said, "Well" he said, "I'm in Chicago visiting my

18   mom."  He said, "I wanted to know if there is

19   anything new."  I said, "Well, Lorin, I've been

20   trying to reach you because I told you about the

21   letter we got and they said they were going to bar

22   us from doing Chapter 13, now we're in the process

23   of losing our home again and you said you had the

24   answers to all this, you were going to take care of

25   it.  You said the $2,500 would be it.  The money I

1    gave your nephew, $1,200, you said it would be all

2    taken care of."  He said, "Are you still in the

3    house?"  I said, "Yes."  He said, "Well, I guess we

4    took care of it."  I said, "No, we haven't taken

5    care of anything.  You were supposed to take care of

6    it."  And he was, "Well, oh...well, we don't need to

7    talk on the phone anymore, we need to meet."  He

8    said...I said, "Well, if you're in Chicago how are

9    we going to meet?"  He says, "Well, I'm coming, do

10   you want me to come back tomorrow?"  I said, "Well,

11   what are you saying?"  I said, "When are you

12   supposed to come back?"  He said, "Monday.  Good,

13   Monday we'll do it.  We'll come back on Monday."

14   Monday I did not get a phone call from him, I got a

15   text message and he told me to contact, he gave me a

16   phone number and a company to contact.  I never

17   called those people but I do have the phone number

18   and I do have a company name that he texted me.

19        Q    Do you remember the name of the company?

20        A    Something like PT.  I don't know, it's in

21   my phone.  The gentleman took my phone.  But he told

22   me this was plan B.

23        Q    Um-hum.  You testified earlier that he was

24   going to help you keep the house...

25        A    Yes.

Tri-County Court Reporting

1          Q    And that this was something that...

2          A    I went...I explained everything to him.

3          Q    Okay.

4          A    We were in a hardship because my daughter

5     had an accident on 471.  Her car flipped four times

6     on the highway.  And I just talked to her five

7     minutes previously.  And her car flipped four times

8     on the highway.  And I was on my way to a meeting

9     for work and this was back in 2000 and...I believe

10    it was 2011.

11         Q    All right.

12         A    2010.  Well, there's so, there's so much

13    going on in our family I can't believe it.  But it,

14    it was just unbelievable.  And I was telling him, I

15    said, "I had to bathe my daughter like she was a

16    baby again for like three months."  She couldn't,

17    she didn't have, she couldn't use her arm.  Her arm

18    actually dragged on the pavement.

19         Q    Oh, my gosh.

20         A    The glass was all broken.  When I went to

21    go see her, her car was still going through the

22    front windshield.  And the man told me, he said,

23    "Someone just died a week ago."  They had the same

24    kind of accident.  A truck hit her and kept going.

25    Just left her for dead.  And I told him what we were

1    going through, the struggle we were going through

2    and the hardship. And this man just took our money

3    and just did away.  I don't know what but it's

4    horrible that people can...

5         Q    I understand.

6         A    ...just do this stuff to people. And he

7    had several clients.  He was helping several people.

8    He gave us some lady named Mary Ann in Clermont

9    County.  And he said, "I helped her."  And he was

10   talking about all these other people that he had

11   helped.  And I though, my God, if he can help them

12   maybe he can help us.

13        Q    I understand.  And I think that's why

14   we're trying to get a little bit more information to

15   understand if there are other people who have been

16   victimized in the same situation that you are and it

17   sounds like there are.

18        A    He told me he was helping people here in

19   Ohio.  He was helping people in Chicago. That's why

20   he was making all these different trips.  But I just

21   told him, he said, "I know what to do.  I can handle

22   this for you, it's no problem."  And here we're

23   still going through the same torment and craziness

24   and nothing has been done.  But I think we've found

25   someone else that can help us that we actually

1    looked up and made sure with the Better Business

2    Bureau and we're in process with them now.  But I

3    told him we're trying to get modifications.

4        Q    Um-hum.

5        A    And he said, "Don't worry about it, I'll

6    take care of it."  And he just saying that he needed

7    more time and he was working on this.  He was

8    talking about somebody that he had, oh God, it was

9    somebody he said in Chicago that knew all about

10   cases like this and...

11       Q    He had the name of someone in Chicago?

12       A    He said that it was a company that he knew

13   in Chicago and that they handle these kinds of

14   things.  And they're the ones that handle mortgages.

15   And he just saying, Chicago this and Chicago that.

16       Q    Okay, thank you, that's, that's very

17   helpful.  I just have one more question and again I

18   think like Mr. DiCesare I was writing furiously as

19   you were speaking so I just wanted to clarify.  The

20   $2,500 in cash that you paid at the Hyde Park

21   Panera.

22       A    Yes.

23       Q    That was in October of 2016 or, I'm sorry,

24   September of 2016?

25       A    It was at...the $2,500 was in February.

1          Q    Okay.

2          A    I actually have an email here where I say

3     house money and I met him that day and gave him

4     $2,500.  Because we had already given $1,200 to his

5     nephew Joel.

6          Q    Also in February of 2016?  I may have

7     written down the dates wrong, I apologize.

8          A    I believe Joel was back in November of

9     2015.

10         Q    Okay.

11         A    That we gave him $1,200.

12         Q    So the $1,200 was November 2015 and then

13    the $2,500 in cash in Hyde Park Panera was February

14    of 2016?

15         A    That is correct.

16         Q    Thank you very much for clarifying that.

17              MS. KINDT:  I have no further questions,

18    Your Honor.

19              THE COURT:  Okay, Mr. Mann, did you have

20    anything you wanted to inquire?

21              MR. MANN:  Yes, Your Honor, thank you.

22    Thank you to the Court.

23                      CROSS EXAMINATION

24    BY MR. MANN:

25         Q    And, ma'am, my name is Michael Mann.  I'm

1    an attorney in Cincinnati. I'm also the chair of the

2    Cincinnati Bar Association's Unauthorized Practice

3    of Law Committee and definitely appreciate you being

4    here.  My main question is you've talked about I

5    think three or four different bankruptcy petitions

6    that were filed.  And I just, I was wondering who

7    actually prepared those documents to be filed?

8         A   He said, Mr. Buckner told me no problem,

9    that his nephew Joel had all that, he and Joel did

10   that.  He told me that he would take care of

11   everything.

12        Q   Okay, so they were the ones who actually

13   completed all the...all the paperwork that was filed

14   with the bankruptcy court?

15        A   That's correct.

16        Q   Okay, thank you.  That's all, thank you.

17            THE COURT:  Thank you, Mr. Mann.  Is there

18   anyone else?  Mr. Pfirrman, did you want to inquire

19   at all?

20            MR. PFIRRMAN:  No, Your Honor.

21            THE COURT:  Do you have any report for the

22   Court?

23            MR. PFIRRMAN:  Do I have any report?

24            THE COURT:  Yeah, I understand you're with

25   Mr. Debbeler's office are you not?

1          MR. PFIRRMAN:  Yes, Your Honor.

2          THE COURT:  And I got a letter from Mr.

3     Debbeler and he identifies someone by the name of,

4     bear with me, Ms. Storey, I apologize, your client I

5     suppose was First Financial and he identifies Gary

6     Stevenson?

7          MR. PFIRRMAN:  Yes, Your Honor.  So our

8     firm represents a number of creditors that are

9     impacted by this.

10          THE COURT:  Um-hum.

11          MR. PFIRRMAN:  One being Cinfed Federal

12     Credit Union.

13          THE COURT:  Um-hum.

14          MR. PFIRRMAN:  In the state court

15     foreclosure action against Celeste Simmons.  We also

16     represent First financial Bank against Margie

17     Ferguson.  It appears based on email addresses, we

18     were notified of those filings by the same person

19     and it appears to be Gary Stevenson associated with

20     EquityMax Network. We don't know if there's any

21     connection.

22          THE COURT:  Um-hum.

23          MR. PFIRRMAN:  But we thought it

24     coincidental that again...

25          THE COURT:  All right.

1          MR. PFIRRMAN:  ...we received notice from

2     the same, same individual.

3          THE COURT: This is very helpful, I

4     appreciate it.  Have you any contact with EquityMax

5     Network, are you familiar with this company at all?

6          MR. PFIRRMAN:  I am not, Your Honor.  We

7     have spoken with Mr. Stevenson. He called to make

8     sure sheriff sales were withdrawn after the

9     bankruptcies were filed.

10          THE COURT:  Um-hum.  Okay, thank...

11          MR. PFIRRMAN:  Or at least, at least in

12     the Ferguson case we spoke...

13          THE COURT:  All right.

14          MR. PFIRRMAN:  ...to him about that.

15          THE COURT:  All right, thank you, Mr.

16     Pfirrman.

17          MR. PFIRRMAN:  Thank you, Your Honor.

18          THE COURT:  Okay, thank you again, Ms.

19     Storey, for your testimony.

20                         EXAMINATION

21     BY THE COURT:

22     Q    When, I'm going to follow up a little bit

23     on Mr. Mann's questions to you.  When these papers

24     were prepared for your daughter's bankruptcy, were

25     you in Panera Bread?  What, what was the setting for

1    that?

2         A    The paperwork was never prepared in Panera

3    Bread.  The only thing he came to Panera Bread was

4    to talk to us about money.

5         Q    Okay.

6         A    Or to talk to us about the case in the

7    very beginning, how he could help us and how he

8    would take care of the whole situation.

9         Q    Okay, so tell me...

10        A    And...

11        Q    ...where you...excuse me for interrupting

12   but tell me where these papers were prepared then

13   for your daughter?

14        A    From my understanding he told us that his

15   nephew, Joel Harvey was going to prepare all the

16   paperwork, we didn't have to worry about that.

17        Q    So...

18        A    And he was here.

19        Q    ...how did he get the information that was

20   put into the papers is what I'm driving at?

21        A    He asked, he asked us for that

22   information.

23        Q    Okay, so how did that occur?  Was it a

24   question and answer?

25        A    We actually talked...yes, we actually

1    called his nephew Joel on the phone and he asked me

2    the things that he had to have.

3         Q    Okay.

4         A    And I gave him that information.

5         Q    Okay, so you spent about how long, about

6    an hour or?

7         A    No.

8         Q    Short time?

9         A    Five minutes, ten minutes on the phone.

10        Q    For...to complete all the papers needed to

11    file the petition?

12        A    Yes, sir.  That's all he asked for, name,

13    address and the name of the mortgage company. That

14    was it. That's all he asked me for. And he sent me a

15    text message that we were supposed to meet a certain

16    day, a certain time here and I had my daughter come

17    in.

18        Q    And so there no subsequent follow up

19    meetings?

20        A    With him?

21        Q    Yes.

22        A    One time when she went to file he

23    actually...she actually went with him to his office.

24        Q    Um-hum.

25        A    And I followed in my car.  She said she

1      didn't have to, she didn't have to ride with me but

2      she was walking down the street and made a left hand

3      turn not far from here.

4           Q   Oh, I see but you don't know the address

5      or his office or the company he works for?

6           A   No, sir, I do not.  I just know it's not

7      far from here, it's within walking distance because

8      she walked with him to the office and made a left

9      hand turn.

10          Q   So this maybe a question better put to

11     your daughter but I'm looking at the petition and it

12     has a signature and I wondered if this signature

13     belongs to you or your daughter?

14          A   Well, anything that had to be signed on

15     the...my daughter was here to do the signature.  I

16     never signed anything as far as...

17          Q   Okay.

18          A   ...bankruptcy.  My daughter did that.

19          Q   Okay, so the petition is dated September

20     the 20th of 2016?

21          A   Yes, she was here.

22          Q   Okay.

23          A   That's when he took that money, $510 and

24     left, said he had to get back to his office and he

25     would come back in the afternoon to file it.

1    Because I said, "What happened, you didn't go

2    upstairs?"  He said, "Well, he said he didn't have

3    time.  He just met with me to get the money. He

4    would go back in the afternoon and take care of it.

5         Q    And how much on that date?

6         A    $510.

7         Q    So filing fee and his fee?

8         A    Yes, sir.

9         Q    And, okay, well I'll ask your daughter. So

10   along with that there were a number of other

11   documents filed on the 20th of September associated

12   with your daughter's bankruptcy and they were also

13   signed.  So I'm assuming that's again her signature?

14        A    When she met with him he said, she told me

15   that he had her sign something.

16        Q    Okay.

17        A    That day.

18        Q    Some document.

19        A    And then he said he was going to come back

20   that afternoon and do it.

21        Q    Okay.

22        A    It was really strange because just a

23   couple of times before that Lorin was saying that

24   she would have to go up herself, that he couldn't go

25   with her.

1          Q    Right.

2          A    And Joel couldn't.  And this time he said

3     he was going to do it him...that he was going to do

4     it later that afternoon, it was really strange for

5     me.

6          Q    So you mentioned now in your testimony a

7     couple of different cases that are filed with the

8     Court and so Mr. Buckner has been involved in all of

9     those cases?

10         A    Yes, sir.  He's the one that said that's

11    what we should do.

12         Q    Okay.

13         A    To take care of the situation, to give him

14    more time.

15         Q    And so his advice to you was to file a

16    series a bankruptcies to keep...

17         A    To allow him time to talk to these people

18    in Chicago, allow him time to talk to some...yeah,

19    he kept saying something about Chicago.

20         Q    Okay, so it looks to me like on

21    the...there's a form called 1015 and I'll ask your

22    daughter about it, but there's a 2014 filing,

23    there's 20, three 2015 filings and two 2016 filings,

24    does that sound about right for a total of one, two,

25    three, four, five, six cases?

```
 1        A    Actually a couple, wasn't a couple of
 2   those done with I think it's Minelli or...
 3        Q    So you had a...
 4        A    We actually had an attorney for...
 5        Q    So how many cases has Mr. Buckner helped
 6   you with?
 7        A    I want to say four, four or five.
 8        Q    Okay, we certainly can look it up, I just
 9   wondered if you knew.
10        A    Yeah, I think it's four or five.
11        Q    All right.
12             MS. RAENESHA STOREY:   2015 on.
13        Q    Okay.
14        A    So I know it started in 2015 in October.
15        Q    All right.
16        A    There forward it was all him.
17        Q    Okay, is there anything else that you
18   think the Court needs to know with regard to your
19   involvement with Mr. Buckner?
20        A    Just the fact that he was making me all
21   these promises and saying that he was going to do
22   this and he was going to do that and it didn't
23   happen.
24        Q    And so the promises again, they were that
25   he was going to help you find a new mortgage company
```

1    or...

2         A    Get us a loan, he said he would get us a

3    loan modification since they didn't approve us for

4    one.  He'd get a loan modification or he would find

5    a way that we would be able to get the payments

6    where they needed to be so we could afford the

7    house.  Because the house is actually worth less

8    money now than what we paid for it.  We paid

9    $327,000 and now the house is only worth like a

10   hundred and some thousand.  So it's just not there.

11        Q    I see.

12        A    And I told him, I said, "That's the reason

13   we were going to do the loan modification."  He

14   said, "Oh, we'll get it done.  Don't worry, we'll

15   get it done."

16        Q    Anyone else besides Joel Harvey and Mr.

17   Lorin Buckner did you deal with?

18        A    No, sir.

19             THE COURT:  All right.  Thank you, Ms.

20   Storey, you may step down.  I appreciate your

21   testimony.

22             THE WITNESS:  Thank you.

23             THE COURT:  Mr. Hewitt?

24             MR. HEWITT:  Yes, Your Honor, I call to

25   the stand Raenesha Storey.

```
 1
 2                    (Witness duly sworn)
 3            COURTROOM DEPUTY:  Please have a seat.
 4    Speak into the microphone, state and spell your name
 5    for the record.
 6            THE WITNESS:  Okay.  Hi, my name is
 7    Raenesha R. Storey.  Raenesha is spelled R-a-e-n-e-
 8    s-h-a. R.  And Storey, S-t-o-r-e-y.
 9                    DIRECT EXAMINATION
10    BY MR. HEWITT:
11        Q   Okay, thank you, Ms. Storey. And just for
12    the record, what is your living address?
13        A   786 Maidstone, M-a-i-d-s-t-o-n-e, Court,
14    Cincinnati, Ohio, 4524...45230.
15        Q   Okay and just trying to take on where we
16    left off for the Court, for the record Mr. Lorin
17    Buckner, how many cases was he involved with?
18        A   Three cases.
19        Q   Would they be the last three cases that
20    was filed with the Court?
21        A   Yes.
22        Q   Okay and so the cases in 2012 and 2014 had
23    nothing to do with him, would that be correct?
24        A   Yes.
25        Q   Okay, as far as meeting with Mr. Joel
```

1    Harvey, the question came up as far as an office

2    location, did you ever arrive at any office location

3    or meet with either Joel or Mr. Buckner at any

4    physical location?

5         A    What happened that day was he filed the

6    Chapter 13 that day at this, at this location.

7         Q    And when you say he, which one?

8         A    Joel.

9         Q    Joel?

10        A    Um-hum.

11        Q    Okay.

12        A    At this location.  And after he filed it I

13   said, "Do we get a copy of that or how does that

14   work?"  Because this is when he first, when he filed

15   it.  And he said, "Oh, yeah, come back, walk with me

16   to my office where I work and I can give you a copy

17   of it there."  And so he told me to follow him so I

18   walked with him downtown.  And that's where he made

19   a copy of it and gave it to me.  I went...I didn't

20   go to the office, I went to like a little side room

21   where he had, like the printing area or something.

22        Q    Do you recall the name of the business

23   that he went to?

24        A    I'm not sure of the name of the actual

25   business, no, but I know it was a law firm, I

1       think...I believe it's a law firm.

2           Q    Okay.

3           A    Downtown.

4           Q    If you were to walk there from this

5       building would you remember where it would be

6       located?

7           A    Yes, I might remember if I go outside and

8       start walking I could kind of figure out exactly

9       where it is.

10          Q    Okay and then as far as the Court brought

11      up the issue of documents, do you remember signing

12      any documents for filing in the bankruptcy?

13          A    I do.

14          Q    Okay, so would it be your belief that the

15      documents filed would contain your signature?

16          A    Yes.

17          Q    Okay and as far as money changing hands,

18      do you recall the date and the amount of money you

19      had given to either Mr. Buckner or to Mr. Joel

20      Harvey?

21          A    The last time we went to court I remember

22      going, giving money to Joel. The first two times I

23      went to court it was money to Lorin.

24          Q    Do you remember the amounts that you gave

25      to either party?

1         A    I know the first time with the court it
2    was, let's see, the first time I went to Court it
3    was $1,200.  I remember giving $1,200 to Joel when I
4    walked in, I had cash money.  And I...
5         Q    Okay.
6         A    ...just passed it over to him.  He said
7    "Thanks."  And then he took...he told me, "Do not go
8    upstairs."  He said the Court would not allow him to
9    go upstairs and file anything, I would have to do it
10   myself.  So he went down and showed me the paper,
11   the documentation.  And I had some legal knowledge
12   of bankruptcy.  And I said, "Where are, where is the
13   spots where I...the pages where I put my debts at?
14   You know, here's my actual debt, you know, debts
15   that I have, do I need to put those on the
16   bankruptcy?"  And he said, "No, don't worry about
17   that."  And I said, "Okay, because usually I thought
18   when you filed Chapter 13 you put your actual debts
19   on there, you write them in."  He's like, "Oh, we
20   don't have to do that right now. Don't worry about
21   that right now."  I was like, "Okay." And so we
22   didn't do anything like that, put any kind of debts
23   on there, we just proceeded to go through it, it was
24   like a skeleton file, from what I could look at it,
25   it was skeleton file. And so he signed it and that

1    was it.  And I went upstairs and gave him $310 the

2    first time and filed it myself.

3        Q   Okay and then was there a money in which,

4    was there another case in which you gave money to

5    Joel or is there an occasion where you gave money to

6    Mr. Buckner?

7        A   The second time we went down to...the

8    first, let's see, I'm trying to think, so many

9    times. The first time was money to Mr. Buckner.  The

10   second time was money to Joel.  So the first time

11   was Buckner, the second time was Joel, third time

12   Joel.

13       Q   So the first time with Mr. Buckner, do you

14   recall the amount you gave him?

15       A   I gave him $310 for the filing fee, he

16   told me that's what we need for filing.  He said,

17   "Exact amount."  And after that it was another $510

18   I think it was on top of it.

19       Q   Do you recall when that was, the dates?

20       A   That date was October something, 2015.

21   The first time for...

22       Q   Okay.

23       A   ...Buckner was October something.

24       Q   Okay, so October 2015?

25       A   Yes.

1        Q    Okay, all right and then the next time you

2    gave money to Joel and then there was a third

3    occasion which you gave money?

4        A    To Joel again.

5        Q    Okay, do you recall how much that was?

6        A    The third time I gave money to Joel was

7    $310 plus another $200 that I gave him for his fee

8    he claimed it was.  That was his fee, so.

9        Q    Okay, do you recall the date when that

10   exchange happened?

11       A    That was in September.

12       Q    Okay.

13       A    The last time.

14       Q    Okay, was that the date of filing,

15   September?

16       A    Yes, it was the day of filing I gave it to

17   him.  And he said, "Don't worry about going upstairs

18   this time."  He said, "I'll take care of it.  I'll

19   take care of it, you go...you can go ahead and

20   leave."

21       Q    Okay.

22       A    He said, "Go ahead and take off and then

23   I'll take care of it later on this afternoon.  I

24   don't have time to do it right now.

25       Q    Okay and when you did meet with both

1    individuals was there any office location that you

2    would recall that you ever met them at?

3         A    No, it was always Panera Bread.

4         Q    It was always Panera Bread?

5         A    Yes.

6         Q    Or outside the...or in a building in the

7    lobby?

8         A    Or this building, um-hum.

9              MR. HEWITT:  Okay, no further questions,

10   Your Honor.

11             THE COURT:  Ms. Kindt, I turn to you

12   again, any questions?  Will you have questions, Mr.

13   DiCesare?

14             MR. DICESARE:  Yes, Your Honor.

15             THE COURT:  Okay, Mr. Mann?

16             MR. MANN:  I may not, Your Honor.

17             THE COURT:  All right.

18             MR. MANN:  I would defer to the Court in

19   terms of anything about the preparation.

20             THE COURT:  Thank you, sir.

21                     CROSS EXAMINATION

22   BY MS. KINDT:

23        Q    Good afternoon.  I'm Monica Kindt, I'm the

24   Assistant United States Trustee here in Cincinnati

25   and I just have a few questions for you today.  You,

1   I'm going to build off of what your attorney just

2   asked you. So the petition that was filed, let's say

3   the most recent one, you indicated that you signed

4   those documents?

5        A   I did.

6        Q   Okay, but it sounds like you also paid the

7   filing fee?

8        A   I did, yes.

9        Q   One of the documents that was filed was an

10  application to pay the filing fee in installments,

11  to pay the filing fee, you know, a bit at a time.

12  Did you sign that document?

13       A   I do not recall signing it, I don't

14  remember signing the document.  I did see that

15  document signed when they showed it to me when I was

16  here last.

17       Q   Okay.

18       A   But I'm not sure, I don't remember signing

19  that one.

20       Q   You, you don't recall if you signed that?

21       A   No.

22       Q   Well, considering you've paid almost

23  $5,000 I thought you've probably be surprised about

24  that document.  Did you make the decision about

25  which bankruptcy chapter to file?

1        A    It was supposed to be a Chapter 13.

2        Q    Okay, but did you decide which bankruptcy

3    chapter or file or did Mr. Buckner tell you which

4    chapter you would be filing?

5        A    He suggested a Chapter 13.

6        Q    Okay and did he talk to you about the

7    differences, what a Chapter 7 and what a Chapter 13

8    is?

9        A    He didn't really...he kind of told us a

10   little, a little bit about it.  I have some

11   knowledge myself about it.  But he did say like that

12   a Chapter 13 would save your house.  He did mention

13   that.

14       Q    Um-hum.  Now it sounds from the

15   information that your mother provided that you

16   provided very little information to Mr. Buckner for

17   doing the...as you call the skeleton petition.  Did

18   he follow up at all with additional requests for

19   information about creditors or information about

20   your assets or anything?

21       A    He did not.  He told me that the first

22   time we filed, he actually took us down again to do

23   a dismissal. And he said...I said, "Oh, we're

24   dismissing it?"  And he's like, "Yes, we just needed

25   time."  So the first time we filed he actually did a

1    dismissal.  So he does...and then the second time it

2    was another skeleton.  And I'm not sure about the

3    dismissal on that one.  I don't remember going down

4    with him to file a dismissal for it at all.  But...

5        Q    Okay, during this process was he providing

6    advice about the foreclosure action that was pending

7    in state court?

8        A    Yes.  He was just saying that he was

9    wanting to get us out of the foreclosure, to work

10   with the mortgage company to make sure that we could

11   make lower payments.  And also he's saying the

12   mortgage company owed us money for some reason

13   because of all the faulty things that was going on

14   with that.  He said that he could help us.  No

15   problem.  He went through the same stuff with his

16   own house.  So he said he knew exactly what to do.

17   Don't worry about it, he'd take care of everything.

18       Q    Okay and did you ever provide a credit

19   report or anything to him...

20       A    No.

21       Q    ...with a list of creditors?

22            MS. KINDT:  Okay, that's all the questions

23   I have right now.  Thank you.

24            THE WITNESS:  Okay.

25            THE COURT:  Thank you, Ms. Kindt.

```
1                      CROSS EXAMINATION

2    BY MR. DICESARE:

3         Q    Hi, Ms. Storey.  We've been talking with

4    your mother as you heard about the meetings at the

5    Panera Bread Company in anticipation of filing.  And

6    that's where money usually changed hands?

7         A    That's where it changed hands, yes.

8         Q    Okay, now and then you would come downtown

9    to actually affect getting the petitions filed?

10        A    Exactly.

11        Q    Where were you when you actually signed

12   the petitions, was it at the downtown meetings?

13        A    Yes.

14        Q    In the lobby here?

15        A    Yes.

16        Q    Okay, that was the case in the first

17   filings?

18        A    All the filings.

19        Q    All the filings.  In any of those

20   filings...well, let's go each one of them.  The

21   first filing, how long were you given to review the

22   documents?

23        A    Not very long.  It was more like a few

24   minutes.  He'd just hand it over.  He's like,

25   "Sign."  He put big X's where we needed to sign at,
```

1    sign.  And he said, "Everything is in here.  Don't

2    worry about this.  We've got it." And I'm looking at

3    it and that's why I know this was a skeleton file.

4    And I said, "Hold on a second.  Where, where's the

5    rest of the documents?"  He's like, oh and he kind,

6    I guess he kind of was shocked that I knew that

7    something was missing maybe, I don't know.  But he

8    seemed kind of a little frantic there. And he's

9    like, "Oh, don't worry about that. We'll take care

10   of that later.  Right now we just need to go ahead

11   and take care of this and the house won't be

12   affected and get this taken care of."

13        Q    Now when people file on their own,

14   sometimes they type the form, sometimes it's

15   handwritten.  I believe almost all of your forms if

16   not all of them were typewritten, so either Mr.

17   Buckner or Mr. Harvey, whoever you're meeting, they

18   have the documents ready when you met them at the

19   courthouse location, is that right?

20        A    Exactly.

21        Q    So there was no preparation of the

22   documents at the time you signed?

23        A    No.

24        Q    Okay and did they go over line by line or

25   did they just hand them to you to sign?

1        A    Just hand over the documents to sign.

2        Q    Did you ask any questions for them to

3    answer about the documents you were signing?

4        A    Yes, that's when I realized I was saying

5    it was a skeleton file and I asked about why my

6    debts were not in there and that's when he told me,

7    "Don't worry about that."

8        Q    Missing schedules of your creditors,

9    things you've seen in your prior cases?

10       A    Things I just...yes, yes, I just have some

11   legal knowledge of that.

12       Q    Okay, but did you go over what was

13   actually in the documents, not what, not what you

14   felt was missing but did you actually go over what

15   was in the documents you...that were prepared for

16   you or did, did he give you the opportunity to ask

17   him any questions about, let's use an example,

18   there's one box that talks about a pleading

19   preparer, did he go over that with you?

20       A    No.

21       Q    Okay, so he'd just hand it to you, ask you

22   to sign them and hand them back?

23       A    Right.

24       Q    Okay and in each of these last three

25   cases, none of them went beyond what you call it the

1    skeletal stage I believe, is that your recollection?

2        A    Yes, that's my recollection.

3        Q    And you would start getting paperwork

4    though, notices and other things from the trustee's

5    office and the Court, separate mailings from

6    separate entities, right?

7        A    Right.

8        Q    And did you talk to Mr. Buckner or Mr.

9    Harvey about anything you were receiving from the

10   time you filed until the time the Judge actually

11   issued an order terminating those cases?

12       A    Yes.  I believe that's when I called and

13   told my mom about it.  I said, "Mom, this

14   is...doesn't look right.  The thing is that we filed

15   skeleton files this whole time.  And he keeps saying

16   he's going to help us, going to help us, going to

17   help us."  Nothing is going on.  I said, "Can you

18   give him, let's give him a call and see exactly

19   what's going to happen next?" And that's when he

20   told us, "Don't worry about."  He's, he's, meet at

21   Panera again and we'll discuss it.  And he showed us

22   some kind of documentation that we have, papers that

23   he drew up that we're going to file next, the

24   mortgage company, to make everything, the

25   foreclosure and everything stop.  "Before I'll file

1    anymore bankruptcies" he said.

2        Q    Now you talked to your mother and Mr.

3    Buckner about the things you were getting from the

4    Court and the trustee, is that right, or just your

5    mother or...

6        A    I talked to my mom about it and my mom and

7    I called Mr. Buckner on the phone.

8        Q    Again?

9        A    Yes.

10       Q    Okay, understood then.  And you did

11   mention or I think your mother mentioned it really

12   got your attention when on this last motion to

13   dismiss the trustee brought to the Court's attention

14   the repeat filings and we were suggesting that maybe

15   you shouldn't be filing for a time, that did get

16   your attention, right?

17       A    Oh, very much so.

18       Q    Okay and that's what, that's when I

19   believe your mother recounted a conversation where

20   Mr. Buckner was still telling you don't worry about

21   it or what did he say to that?

22       A    He said, "Don't worry about it."  He's

23   like, "Actually I've never seen this before, I don't

24   know what this is."  He's like, "I have no clue what

25   you're talking about.  This is absurd."  I said,

1       "Well, it's absurd, you're saying it's absurd but I

2    have this in writing in my mailbox here.  I opened

3    my letter and this is what is what I'm seeing.  So

4    obviously it's not absurd, it's the truth, it's

5    real."  He said, "Well, I have no clue what to do

6    about that." And I said, "Okay, so what do we do

7    now?"  He said, "Well, I've got to think about it.

8    I'll call you back." And he hung up the phone. And I

9    said, "Okay, this has gone far enough.  I am so over

10   the situation."  I called Mr. Hewitt and I was like,

11   "We need to do something about this.  Go to court,

12   do something."  Because at this point I don't know

13   what to do with this guy.  I think he's really a

14   little, you know, crazy.

15       Q   Well and I have been asking, he wasn't

16   giving you advice on the case as you went or

17   answered your...I mean...strike that, let me start

18   over.  You may have been asking him questions but

19   was he giving you any answers about the actual case

20   and what to do in the case?

21       A   No, he was just saying he was taking care

22   of it.  We're going through the...there are certain

23   things you have to do, paperwork, things that need

24   to be filed.  He kept asking for different

25   documentations about a TIL or something he needed

1    from us.  He just kept asking for different things.

2    And we told him, okay, we were looking for the TIL,

3    we couldn't find the TIL. He said, "Okay, we'll get

4    the TIL." He said, "Well, don't worry about it, you

5    don't need a TIL, I'll do something else." And then

6    we worked on something else he said.  Then he

7    brought, told us to meet at Panera and brought some

8    documentation that...I do have those. And said that,

9    "We're going to do those, file these next once you

10   find the TIL."  And I said, "So do we need a TIL or

11   don't need a TIL?"  And he said, "Oh, well, if you

12   can't find it we'll do a plan B."

13        Q    You mean, do you mean the truth and

14   lending statement from when you took your mortgage

15   out originally?

16        A    Exactly.

17        Q    Okay and you, you and your mother have

18   both described in detail how much you paid for what

19   at the beginning of each case, did Mr. Buckner or

20   Mr. Harvey ever ask you for more money on any case

21   after it was pending?

22        A    We gave him money several times.  Every

23   time we met him at a Panera there was money out.

24   So...

25        Q    But I mean, how do I put this, for

1    example, you get, you talked about a lump sum that

2    you paid him for filing fee and his fee or your

3    mother did.

4        A    Yes.

5        Q    Your mother described the filing fee and

6    the fee he wanted for his own work at the beginning

7    of the case?

8        A    Yes.

9        Q    And that case gets filed. Before you

10   started paying him for the next case was he

11   collecting money while the case was pending for the

12   case that was pending?

13       A    Well, basically we gave him big lump sums

14   of money, $2,500 for the first case...

15       Q    Um-hum.

16       A    ...even though another case wasn't filed

17   at that time.  Then we gave him another $1,200. So

18   we just, we were giving him money through the whole

19   process.  I'm not really...I mean the first case was

20   filed, we gave him money. The second case was filed,

21   we gave him more money.  We gave him more money the

22   day, the same day we came to Court to file it as

23   well.

24       Q    Okay.

25       A    There was more money being collected.  I

1     felt like it was just a money, it was a money

2     situation the whole entire time, so.

3           MR. DICESARE:  Okay, thank you very much.

4     Thank you, Your Honor.

5           THE COURT:  Thank you.  Any other parties

6     wish to inquire?

7                         EXAMINATION

8     BY THE COURT:

9       Q   Okay, let me just ask very quickly, Ms.

10    Storey, did Mr. Buckner ever represent himself as an

11    attorney?  Did he say he was an attorney, paralegal

12    or anything...

13      A   No.  He said that actually attorneys can't

14    do the work that he does because they're afraid of

15    certain courts or certain foreclosure actions.

16      Q   Um-hum.

17      A   So he said that he does the work he does

18    because he knows how to do it because he's done it

19    himself because his own house has been jeopardized

20    by mortgage companies and he knows exactly what to

21    do.

22      Q   Okay.

23      A   To get this done.

24      Q   All right, so how do you think Mr. Buckner

25    got your name?

1         A    He mailed a letter to the house and we

2    opened up the letter.  I'm not sure how, I think

3    he...oh, how did he get our name?

4         Q    Yes.

5         A    I believe he got our name for the

6    foreclosure.

7         Q    Um-hum.

8         A    Because, you know, it's public knowledge.

9         Q    Right.

10        A    I believe that's how he got our name.

11        Q    Okay and so he mailed you a letter and

12   that letter indicated where you could reach him?

13        A    Exactly.

14        Q    I see. When you signed the petition and

15   the application, all the documents, I'm just looking

16   at the case that's now before the Court but it

17   generally applies to all the other cases but let me

18   just, the three other cases that Mr. Buckner helped

19   with. For this case though I have in purview here

20   you filed a skeletal petition as you indicated.

21        A    Yes.

22        Q    You also filed a statement of Social

23   Security Number, a statement under form 110, 1015...

24        A    Um-hum.

25        Q    ...which lists your other bankruptcies, do

1    you remember signing that?

2         A    I believe, yes, I do remember signing

3    that.

4         Q    And a verification of the creditor

5    maintenance, matrix, you've asked about that because

6    it only lists one creditor and you want...

7         A    Yes.

8         Q    Okay and the application to file the fees

9    in installments?

10        A    Yes.  I was...

11        Q    So did, did you have those papers or did

12   Mr. Buckner generate those papers and just told you

13   to sign them?

14        A    Mr. Buckner generated the paperwork and

15   asked me to sign them.

16        Q    Okay and so when he presented those to you

17   downstairs I'm assuming?

18        A    Yes.

19        Q    They were already typed and he had the

20   information in them?

21        A    Exactly.

22        Q    And you simply signed.  Okay and so you,

23   you have emails as well in exchange between you and

24   Mr. Buckner?

25        A    I have one email that was sent to me by

1    Joel Harvey.

2         Q    Um-hum.

3         A    I do have one email with the last filing

4    that we did.  He sent it directly to my email

5    address.

6         Q    Is that a private email address or is that

7    associated with the business, can you tell?

8         A    It looks like a private one.

9         Q    Okay.

10        A    It looks like one, yeah.

11        Q    Okay.

12        A    I can double-check if you like.

13             THE COURT:  All right.  Mr. Hewitt, you

14   did have some copies of email, emails?

15             MR. HEWITT:  Yes, yeah.

16             THE COURT:  You referred to them, I don't

17   know that we ever marked those as exhibits.

18             MR. HEWITT:  We did not mark them as

19   exhibits but I guess we could mark them as exhibits.

20   I don't know how you want to phrase it as far as my

21   clients being either defendants or petitioners. But

22   we could turn them over to the Court and be marked

23   and admit them into evidence if it so pleases the

24   Court.

25             THE COURT:  Okay, right.  Let's mark them

1    just as Debtor's Exhibit A.

2              MR. HEWITT:  Okay.

3              THE COURT:  And can we retain these copies

4    or do you need copies?

5              MR. HEWITT:  Yes, I think they, I think

6    they're able to print them out from their own

7    computer, so I don't think it's a problem, would

8    that be correct?

9              THE COURT:  Ms. Francis?

10              THE WITNESS:  That's fine, I don't have...

11              MR. HEWITT:  Okay.

12              THE WITNESS:  ...a problem with leaving

13    them.

14              THE COURT:  Would you get those?  We'll

15    mark these as Debtor's Exhibit A.  Let me just see

16    that.

17         Q    So  I'm looking at the emails and I guess

18    LKBCoach@gmail.com, is that familiar to you, is that

19    Mr. Buckner's address?

20              MS. NETTER-STOREY:  Yes, yes, it is.

21              THE COURT:  Okay.

22         A    I, I...he didn't email, Mr. Buckner didn't

23    email me, only Joel.

24         Q    All right.

25         A    So I think my mom says yes, so that's

1    probably right.

2         Q    All right and yours was only conversations

3    on the phone and the one email between you and Mr...

4         A    Joel.

5         Q    ...Stevenson is it or Joel Harvey, Mr.

6    Harvey?

7         A    Yes.

8         Q    Okay, is there...oh, here it is.

9    Joel.Harvey@gmail.com?

10        A    Yes.

11        Q    Who or what is this Storey's Law?

12        A    That is my email address.

13        Q    Oh, I'm sorry.

14        A    RStoreylaw@gmail.com.

15        Q    Okay, okay, thank you very much.  I don't

16   know that I have any more questions for you at this

17   point, Ms. Storey.  I appreciate your testimony.  Is

18   there anything else you want to share with the Court

19   about what's transpired here?

20        A    I'm very in disarray of the situation.

21   It's just really disheartening that this happened.

22   Wanting help from someone and this happens as a

23   result of it, so.

24        Q    Um-hum.

25        A    You know, I'm sorry to file so many

1    bankruptcies that went nowhere.  I just didn't know

2    that was going to happen either.

3         Q    Right.

4         A    So it just makes me look like I'm the bad

5    person in doing all the filings when the reality was

6    it wasn't even me filing it. So it's just really a

7    situation that I wish we weren't in, so.

8         Q    Perfectly understandable.  Okay, thank

9    you, Ms. Storey, you may step down.

10        A    Thank you.

11             THE COURT:  Okay, so back to the show

12   cause proceedings.  Mr. Buckner did not appear

13   today.  As I indicated earlier he did file a motion

14   asking for a 60 or 90 day continuance, I can't

15   recall which and the Court denied that.  Obviously,

16   Ms. Kindt this gives the Court great pause for

17   concern when we've heard the evidence we did today.

18   I was looking to see if anything could be done in

19   the interim.  It looks like § 110 gives this Court

20   authority to enjoin activity once there's been an

21   action filed by the United States Trustee or another

22   interested parties.  I can't remember, it listed a

23   number of persons.  But it would seem to me given

24   the nature of what we have heard from Ms. Storey and

25   what this Court is aware of, based upon subsequent

1    cases that have been filed.  I guess one was filed

2    just yesterday by an associate of Mr. Buckner, this

3    Mr. Stevenson that Mr. Pfirrman identified filing

4    another bankruptcy case.  He somehow appears to be

5    affiliated with Mr. Buckner or any company that he's

6    associated with.  It would be my intention pursuant

7    to this Court's injunctive power given under §

8    105(a) to issue an order, apparently he filed three

9    cases yesterday, enjoining Mr. Buckner or any

10   associates or companies that he's associated with

11   from filing any more bankruptcy cases on behalf of

12   debtors in this Court until such time as you're able

13   to gather whatever information you need to prosecute

14   under § 110.  So the Court will issue an order

15   forthwith today or tomorrow enjoining Mr. Buckner

16   and Mr. Stevenson and any other associates of theirs

17   from continuing to file matters.  Obviously that

18   injunctive order will only be as good as it is

19   observed given Mr. Buckner's lack of presence here

20   today, I'm not sure that he is going to be inclined

21   to follow the Court's order but we will at some

22   point have his attention I assure you.  If it's not

23   through your office certainly through the Federal

24   Bureau of Investigation seeing if we can enjoin his

25   activity because it is causing quite a stir and

1   hardship on our community.

2           Okay, there's nothing further from the

3   Court.  I will await your action then, Ms. Kindt and

4   hopefully we'll get this matter squarely before us

5   and we can have Mr. Buckner before the Court to

6   express our discontent with his activity.

7           What is this MTD?  What does that mean?

8           MR. DICESARE:  Your Honor?

9           THE COURT:  Okay.

10          MR. DICESARE:  Yes, Your Honor, as to the

11  status of the cases in chief on these, Mr. Brantley

12  and Ms. Bibbs have been dismissed.  Ms. Simmons has

13  an uncontested dismissal motion pending and we've

14  uploaded a proposed order this week. But I believe

15  we did table the motion to dismiss on Ms. Storey's

16  case to see how things turned out.  And again the

17  trustee would like to withdraw her request for

18  prejudice but the question remains whether or not

19  Mr. Hewitt and Ms. Storey believe she should

20  prosecute this case or allow it to terminate and

21  just refile if Mr. Hewitt or another competent

22  bankruptcy counsel wants to go forward.

23          THE COURT:  What's your pleasure, Mr.

24  Hewitt?

25          MR. HEWITT: Talking to my client, Your

 1    Honor, it's my understanding that they are inclined

 2    to dismiss the petition because I think they have

 3    found a lender to which they wish to work with and

 4    go through a loan modification, would that be

 5    correct?

 6          MS. STOREY:  Yes.  I just want to dismiss

 7    the filing for two years, whatever the thing was.

 8          MR. HEWITT:  Yeah, that would be from the

 9    trustee.  But as far as your intent, you don't still

10    plan to go through with the  13...

11          MS. STOREY:  No.

12          MR. HEWITT:  ...petition, correct?

13          MS. STOREY:  I do not.

14          MR. HEWITT:  So we'll probably most likely

15    withdraw or voluntarily dismiss the petition but

16    we're also hoping for a ruling that if the trustee

17    does dismiss, they brought up the issue to dismiss

18    without prejudice.  I believe two year...

19          THE COURT:  I think he's withdrawn, I

20    think he's withdrawn that request.

21          MR. HEWITT:  Okay.

22          THE COURT:  Why don't you get together

23    with Mr. DiCesare and prepare an order and we'll

24    file, enter that order dismissing the case and

25    removing any prejudice under 109(g).

1          MR. HEWITT:  And one last thing, Your

2     Honor, just for the benefit of my client, who would

3     they, is it going to be through the Court as far as

4     any possible reimbursement for the money that they

5     lost?

6          THE COURT:  Right, if you look at § 110,

7     Mr. Hewitt, I'm not sure, I think your client can

8     also file an action under 110.

9          MR. HEWITT:  Okay.

10         THE COURT: There is damages, there are

11    damages available for debtors injured by petitioner

12    preparers who've...

13         MR. HEWITT:  Okay.

14         THE COURT:  ...violated the statute.

15    There are penalties associated with it as well.  But

16    clearly there is a provision for damages to a debtor

17    so there is maybe an avenue for some recovery.  I

18    will advise though, Mr. Buckner has filed his own

19    Chapter 13 bankruptcy which is pending before this

20    Court.  So the question of collectability is an open

21    one.

22         MR. HEWITT:  I understand.  Thank you,

23    Your Honor.

24         THE COURT:  But at least you can perhaps

25    obtain a judgment from the Court and garnish wages

1    or any other assets subsequent to Mr. Buckner's exit

2    from the bankruptcy court if that's what transpires.

3              MR. HEWITT:  Okay.

4              THE COURT:  All right.  Mr. DiCesare,

5    anything further?

6              MR. DICESARE:  No, Your Honor. Thank you.

7              THE COURT:  Ms. Kindt?

8              MS. KINDT:  Your Honor, just a, just a

9    purely administrative matter.

10             THE COURT:  Yes.

11             MS. KINDT:  Since a lot of these cases

12   have been dismissed I just wanted to make sure that

13   they would be kept administratively open so that...

14             THE COURT:  Yes.

15             MS. KINDT:  Thank you.

16             THE COURT:  Yes.  They're going to be

17   dismissed but they will not close.

18             MS. KINDT:  Thank you very much.

19             THE COURT:  So you can certainly still

20   file whatever is needed to prosecute those actions

21   under 110.

22             MS. KINDT:  Thanks.

23             THE COURT:  Thank you.  We're adjourned.

24             COURTROOM DEPUTY:  Please rise. Court is

25   adjourned.

1
2                              (Off the record)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                C E R T I F I C A T E
 2    STATE OF OHIO
 3                         SS
 4    COUNTY OF CLERMONT
 5
 6          I, Cindy Elaine Meguire, transcriptionist
 7    and notary public, do hereby certify that the
 8    foregoing was transcribed from an audio recording by
 9    me, and that the same is true and correct in all
10    respects as transcribed from said audio recording.
11          I further certify that I am not counsel,
12    attorney, relative or employee of any of the parties
13    hereto, or in any way interested in the within
14    action.
15          IN WITNESS WHEREOF, I have hereunto set my
16    hand on this 19th day of December, 2016.
17
18
19
20                          _____
21    My Commission Expires:      Cindy Elaine Meguire
22    May 3, 2019                 Notary Public-State of Ohio
23
24
```

Tri-County Court Reporting